Your Honor, the first case of the morning, 12-212-470, Perkey v. Portes-Jarol, on behalf of the F. Law Office, Mr. James Horstman, on behalf of Charles Perkey, Mr. Dave E. Trost. Mr. Horstman. Thank you, Your Honor. May it please the court, counsel, good morning, Your Honors. Good morning. My name is Jim Horstman. I represent the defendant's appellants in this matter. I'd like to begin by acknowledging the sad loss that forms the background for this appeal. There's no dispute that in the background of this is really a tragic death. This appeal focuses, however, on other issues, technical issues, sufficiency of the record to support the judgment. In our brief, we've raised four issues. I would like to rest on our briefs as to the proximate cause issue, which is Argument 2 in our briefs. And I'd like to focus on the standard of care issue, which is Issues 1 and 3 in our brief, and also on the Section 2-1205 issue, which is Argument 4. And the primary difference is qualified versus reasonable in terms of what a doctor would do? On the instructional issue, yes. Okay. Under the student opinion. Okay. The 2006 versus the 2005 version. Both Arguments 2 and 3 go to the important standard of care element. Argument 1, we attempt to show that plaintiffs' only expert on the standard of care for a family practice position, which is what defendant Dr. Portis was, relied on a wrong legal standard. Stude versus Sherman Health System says the standard of care is supposed to be what a reasonably well-qualified physician would do. Dr. Rubin, however, the only standard of care expert the plaintiff had to testify on the standard of care for a family practice position, adopted a strange and idiosyncratic view of what the standard of care was. She repeatedly said the standard of care is what 80% of physicians would do without reference to qualifications or their level of care. She also, maybe these questions were leading, but answering questions where the testimony was, the questions included degree of care, knowledge, and skill a reasonably careful physician would use. So those questions were also asked, correct? Your Honor, yes. They were leading questions on direct. Plaintiff's attorney said, well, he led her to embrace the reasonably careful standard. But then back on cross, when we came back to her as to what the standard of care was, she reverted once again to the standard of care being what 80% of physicians would do. She did that twice. She reduced the reasonably careful or reasonably qualified standard to what 80% of physicians would do. But if she's answered it then in two different ways, doesn't it then become the responsibility of the jury to determine the weight, you know, to be given the witness's testimony? Well, I'm not so sure about that, Your Honor. She did, first of all, I think that she qualified and explained what she meant by reasonably careful. But we have a standard of care issue that the jury is not qualified to determine itself. And if you have two separate witnesses who are conflicting, yes, the jury has to determine which one. But when you have one witness who's giving arguably at best conflicting views on what the standard of care is, it doesn't make the jury any more capable of determining what the standard of care is. I still think we have a fundamental defect in the evidence. And my reading of the record is although she was led to embrace the reasonably careful standard, she did later explain that what she means by that is in her mind a reasonably careful standard means what 80% of the physicians would do. In our view, because she reduced the standard to this 80% standard, there's really a complete absence of evidence in the record based on the proper standard. All you have is testimony from Dr. Rubin that based on 80% standard, she believed Dr. Portis reached the standard of care. Now, does this issue go to whether or not there should have been a directed finding or directed verdict? Or are you applying this now generally to the whole case? I believe it goes to whether there should have been a directed finding and whether or not there should be judgment notwithstanding the verdict. And for a directed finding, don't we need some evidence of the standard? And in fact, haven't you just said that she did, although she was led with questions about knowledge and care and reasonableness and answered yes, she ultimately, you're saying because she ultimately went back to the 80%, we do not have some evidence of a proper standard of care? That is my position, that she explained or qualified what she meant by reasonably careful. And again, we're not talking about an inconsistency between two experts. We're talking about one expert explaining what she thinks the applicable standard of care is. So Dr. Portis is found guilty based upon what 80% of physicians would do instead of what a reasonably well-qualified physician should do. And I'm assuming she was qualified as an expert as she was presented with her knowledge of the area as well as other litigation she's been involved in. No issues to her qualifications, correct, Your Honor. In our view, this deficiency in the proofs was exacerbated by a standard of care instruction being given. This has been disapproved by the Supreme Court in Stute v. Sherman Health Systems again. I'm referring now to our Argument 3. The trial court here gave the 2006 version of IPI 105.1. That's the reasonably careful instruction. The Supreme Court in Stute said that that does not accurately state Illinois law. It was held not to be a reversible error. Correct. Where's the prejudice here where the instruction did, even though it uses that language, also refers to the other proper definition? I think the prejudice here is that it doesn't clearly articulate. It isn't. I think Stute said that the 2005 version of IPI 105.1 should be used. This instruction did not clearly articulate the well-qualified standard. And in contrast to Stute, the Supreme Court in Stute said, well, it wasn't good to give the 2006 version, but in this case it's harmless because the jury was otherwise properly informed of the applicable standard. That can't be said here. Here we have the problem of Dr. Rubin telling the jury that the standard is the 80 percent standard. We have plaintiff's counsel and he's attempting to lead her to what should be the proper standard. He doesn't use the reasonably well-qualified standard. He gets her to embrace the reasonably careful standard, which is the one that Stute disapproves. So unlike Stute, we don't have a there's no harmless error analysis to be made here. We have a jury that's left with not only an instruction that's disapproved by Stute, but in addition their misled belief by Dr. Rubin that the correct standard is either reasonably careful or 80 percent. So it's all over the place. But critically, they don't they're never told clearly what the proper standard is, the 2005 version of IPI 15.01. As to the deficiency in the proofs, we look for judgment in favor of the defendants. As to the instructional error, if the court is focused solely on that, the proper relief would be a new trial. The other issue I'd like to address is argument four in our brief, and that's the section 2-1205 reduction. Section 2-1205 entitles a defendant to a reduction in the judgment equal to 100 percent of the medical benefits that have been paid or are payable by an insurer, except if the insurer has a right to recoup some of those payments or to the extent that an insurer has a right to recoup some of the payments that it made from the plaintiff. And the thought is you shouldn't reduce the judgment if the plaintiff might have to still pay the insurer back for benefits that the insurers pay. So that makes sense. The Supreme Court looked at this statute in Witherell v. Weimer. Whose burden is this to bring this before the court at the time of the hearing? I mean, when does it come up, and whose burden is it to prove the issue? It first came up in a motion to reduce the judgment, I think, days after the entry of the judgment. And that was within the time period allowed by the statute, correct? And it is the defendant's burden across the board. It's the 212.05. It's definitely the defendant's burden. Supreme Court said the purpose of 212.05 is to prevent a double recovery and said that plaintiff's recovery is limited to those items for which it has not been reimbursed. Here, the trial court held that the defendants were entitled to no reduction at all, zero dollars reduction. And in our view, it's based on principally three errors in analysis. First, the trial judge erred in identifying the gross amount of benefits that might potentially be qualified for the reduction. And you can see this by looking at the trial judge's order of November 22, 2011. We quote that at page 23 of our brief. She considered as the amount potentially qualifying for the reduction only the amounts actually paid by the insurer. But the problem with that, if you look at the statute, the statute says the gross amount potentially qualifying for reduction are the amounts paid and payable by the insurer. So the trial judge clearly used the wrong standard. And here it made a big difference. And what's the amount that you think is the gross amount or the paid and payable amount? The amount actually paid, I think, is not in dispute. It's $134,000. The amount payable, I think, is not in dispute because it's based upon the plaintiff himself. The amount payable is the amount that the plaintiff submitted to Blue Cross Blue Shield for payment. And that's $358,712. That is the amount of the medical bills that plaintiffs submitted to Blue Cross Blue Shield saying, hey, this is payable. So it's a figure not derived from anything defendants have said or computed. It's plaintiff's figure. That's the stack of bills, $358,712. That's what plaintiffs submitted. It's a big error here. The difference between the $358,000 and the $134,000 is almost $225,000. That's the gross amount that we're talking about that might qualify for the set-off. So that's error number one. Error number two, we believe, is that the trial court ignored that Blue Cross Blue Shield has no right of recruitment against the administrator of the estate of Leanne Perkey. The administrator of the estate, of course, is a fictional person. It's someone appointed by the court to collect the assets of the estate. Here it happens to, the administrator happens to be Charles Perkey, who is the husband of the decedent. Of course, it could be anyone, anyone who the court chooses to appoint. The administrator, obviously by the timeline here, didn't even exist until after Leanne Perkey had concluded her medical treatment and after she had died and after a lawsuit had been filed. So in the timeline of things, the administrator wasn't even around when the medical treatment was being provided and any contractual relationships. It's a later created legal entity. Now, Blue Cross Blue Shield is asserting a contractual right of recruitment based upon the health care plan documents. Charles Perkey was an employee, I believe, of the city of Waukegan. There was a health plan, his wife was covered by it. And Blue Cross Blue Shield doesn't have a contract with the administrator of the estate of Leanne Perkey. There's no legal basis for it to enforce a right of recruitment against the administrator. If members of the plan are subject to the rights of recruitment, maybe beneficiaries of the plan are subject to rights of recruitment, but the administrator of the estate of Leanne Perkey is a separate legal entity. But he's doing, the administrator, whoever that person is, is doing this on behalf of some persons or some other people who are involved and isn't the primary one, the named administrator here. He's the beneficiary of this particular estate. I don't think that's true, though, Your Honor. I don't think that the administrator is doing work for the benefit of the beneficiaries. I think it's an independent function. It's an independent role. Administrators can have liabilities. They have certain duties that go along with the task. Ultimately, at the end of the day, when the estate is dispersed, it's going to go to beneficiaries. But the administrator of the estate is a separate legal entity. It's not Charles Perkey. They're two separate legal persons. And we're talking about a contractual right of recruitment. This administrator didn't even exist when the health plan went into effect, when the medical treatment was provided, when Lee Ann Perkey died, only created after, in this timeline, after the lawsuit was filed, or at the time when the suit was filed, when the administrator was appointed. You said you had three points. You want to make your third point? Yes. And then you'll have time for this. Thank you, Your Honor. The third area is that the trial court erred in assessing the amount of Blue Cross Blue Shield's right of recruitment. Now, we think that there's no right of recruitment because it was the administrator. But the trial court thought there was a right of recruitment. But even then, Blue Cross Blue Shield told us, in its most recent communications, it believes its right of recruitment is equal to $89,736. Plaintiff argued that it was the amount of $134,000, a number that he got from earlier communications with Blue Cross Blue Shield. For reasons that don't appear in the record, the trial judge chose to take the figure suggested by the plaintiff in contradiction of what Blue Cross Blue Shield said its right of recruitment was. It said unequivocally it is seeking, at most, $89,736. Instead, the trial court went with the larger number, $134,000. And today, your primary argument is it's the wrong party. But if this court were to consider some recruitment, you would say it should be the $89,000 amount, correct? Yes. The equation we'd be suggesting to the court is the gross number would be the $358,712, which is paid and payable, minus the $89,736 that Blue Cross Blue Shield has said is the amount of our right of recruitment. That's the equation. And the record isn't completely devoid of the judge's reason. Didn't she basically strike these documents because she felt that they should have been discovered earlier? And your argument was, well, we tried, but we found out that maybe there was some improper direction to Blue Cross Blue Shield? Yeah, kind of a two-part. The representations that were made at the time of the motion for reduction were the three big representations were wrong. It wasn't true that Blue Cross Blue Shield had paid all the medical bills. There were $358,000 worth of medical bills. Representation was made by the estates that all of them had been paid. Turned out that wasn't even close to being right. There was only $134,000 that were paid. Secondly, representation was that Blue Cross Blue Shield was seeking recovery of $134,000. That wasn't true. Blue Cross Blue Shield itself said we're only seeking $89,000. And third, what was presented to the court at that time was a one-page of the health plan describing Blue Cross Blue Shield's right of recovery. And, in fact, it was multiple pages as we later found. The reason we couldn't get the documents is that, and I don't think it was disputed, the plaintiff's attorney told Blue Cross Blue Shield, don't give it to them. We had to serve a subpoena. And even after the subpoena was issued, Blue Cross Blue Shield, as the record shows, fought that subpoena. So the reason is your Honor. And on what basis? What basis did they fight it? I believe it had to do with medical confidentiality. But it's not terribly clear. Now, that number that you just gave us of $89,736, that doesn't seem to be consistent with the number that you cite in your brief on page 33, where you indicate that defendants would be entitled to a statutory reduction of no less than $165,000. Can you reconcile that for me? This is on page 33 at the end of the first paragraph. Can I take that up on rebuttal? Sure. Rather than standing up here? Yeah, that's fine. You can take a look at it and let me know. Okay. Thank you, Your Honor. Thank you. Mr. Kregel? Good morning. May it please the Court, counsel. I'm going to address these issues in the order that counsel for the appellant addressed them. And won't spend too much time on the issue of the expert witness and the jury instruction. What is the standard of care? The standard of care is a legal definition. That degree of care knowledge and skill that a reasonably careful family practice physician in this case would use under Likerson or circumstances. It's a legal definition. And if you were to probably poll 100 experts who have testified here in the state of Illinois and ask them individually, you know, what's your definition of standard of care? Very few of them would rattle off that legal definition. The issue is not that. It's their familiarity with the standard of care as it's defined in the jury instructions. And in this case, Dr. Rubin clearly stated, I am familiar with that standard of care. And in reaching my opinions in this case, I am applying that standard of care. Well, where does the 80% come from that she referenced? What is that particular issue? And I'm assuming it was explored both on cross and direct. But, I mean, she's your witness, so what? She just said it's what a typical physician would do. Her actual testimony is the standard of care is that care that the patient would receive in a typical doctor's office, the care that 80% of doctors would give to that patient. That's how she viewed it if you were to ask her her definition. For purposes of this trial, however, in all of the opinions that she gave, she applied the legal definition as it exists in the state of Illinois. And on any evidence or some evidence standard, I don't know how it could be any more clear than it is in the record, that she was familiar with it, understood it, and applied it. But she kept repeating the 80%. Essentially, the defendant's argument is that no matter how you view it, that is not correct. It's essentially saying that 20% of the doctors out there don't know what they're doing. No, but again. It's a jury to view that when they're looking at the evidence. But that's not what she based her opinions on in this case. And that's clear from the record. She applied, regardless of what her own individual standard is, the one that she applied in this case and the one she said that she was familiar with, was the appropriate standard that's defined in the IPI instruction. And did you, during the course of this, since we're not watching it happen, did she see the instruction or did you read the instruction? How did she come to know what the instruction said? Well, I didn't show her the instruction, obviously. I asked her, in looking at the issues in this case, when assessing the standard of care, did you apply the degree of care, knowledge, and skill that a reasonably careful family practice physician would use in Chicago in 2001 in like or similar circumstances? She said yes. And then she said the standard of care should be the same wherever. Correct. Are you familiar with the standard of care? And she said, I believe the standard of care for a reasonably careful family practice physician, as that standard existed in Chicago in the year 2001, I believe that the standard of care is the same in Chicago as it is in the rest of the United States. Our board certification is national, and it is a national standard of care. So yes, yes. And then someone said, and what is, well, you had already said. Right. And when I ask you questions today that use the term standard of care, I mean that degree of care, knowledge, and skill that a reasonably careful physician would use in like or similar circumstances in the year 2001, do you understand? I understand. Did she refer to the 80% in your examination, or was it in cross-examination? Other than what was read to the court, no, she did not. And then there was cross-examination on that issue. But, again, on any evidence or some evidence standard, and there was no objection made as she was giving any of her opinions. There's insufficient foundation. She doesn't understand the appropriate standard. There were no objections at all. She was qualified as an expert. Correct. Before the jury, in addition to at her deposition, but before the jury she was qualified. That's right, Your Honor. She had a practice where I believe it's either 1,500 or 2,500 patients. A significant percentage of those were general family practice patients. She's board certified. There was no objection that she wasn't qualified by background training or experience to offer the opinions that she did. Second, with respect to the jury instruction, I don't mean Stutt as saying reasonably careful is not the appropriate standard. The infirmities in the instruction in Stutt had to do with the removal in the 2006 version of that degree of care, knowledge, and skill, which is included in this particular instruction. Also one of the infirmities was whether or not there was an improper emphasis on evidence other than expert witness testimony in the Stutt instruction as well. Here that's not an issue because the only evidence in front of the jury was expert witness testimony, and the instruction only said you must rely on the testimony provided by expert witnesses that you've heard here. In fact, if a case were to go to trial today and the 2011 version of 105.01 were to be used, which is what we're instructed to use, it would contain the words reasonably careful. And 2011 is well after Stutt. And I think as indicated in my brief, the case was tried in October of 2011. The IPI was amended in September of 2011. The one that I submitted was the one that was on the website the morning that it was submitted, which used the term reasonably careful. The judge used a court's instruction, which used reasonably careful, but essentially traps the 2011 version of 105.01. So first of all, there's no evidence that the jury was in any way confused at all by any of these issues regarding the standard of care. Second of all, the law in Illinois to this day is that when you are assessing the actions of a professional, that it is that degree of care, knowledge, and skill that a reasonably careful professional would use in the same or similar circumstances given the state of the standard at the time of the event. With respect to 212.05, it's difficult for me to follow all of the calculations that are set forth in the brief. Here's a question that doesn't involve calculation. How can you argue that all the care was directly attributable to the actions of the defendant? What overwhelming evidence was that the cancer was there? Subparagraph 5, I would not advance today. It was an error in argument in the brief. It should not have been made. And the reason that the court ruled that there was no reduction was not for any of the reasons cited by counsel in their briefs. It was because of the plain language of the statute in subparagraph 2 and the York case which interprets subparagraph 2, which is the only case that I've seen that interprets that section, which simply states if there is a right of reimbursement, or this is how it's interpreted, if there's a right of reimbursement, then the reduction does not exist. Now, Your Honor's question was the correct question. If or to the extent of? Because it's different, isn't it? You're using the word if in place of the words to the extent of, correct? But the plain language of the statute doesn't say to the extent of the amount of reimbursement claimed. To the extent that there is a right. Correct. To the extent that there is a right. And if they were going to say you get a reduction to the extent of the amount that the health care provider is entitled to recover, I would suggest that the statute would read, such reduction shall not apply to the extent of the amount of reimbursement claimed through subrogation, not the right. And the plain language of the statute and the way that York interprets the statute is that if there is a right, and York clearly states, it doesn't matter how much the right is, whether it's ever exercised or not, but the existence of the right itself bars the reduction. And that's what Judge Mullen relied on primarily in denying the motion for reduction. Your Honor is correct. It's their burden at the time of this motion to reduce to present to the court evidence that there is no right of reduction, and they didn't do that. The only evidence before the court as to what the lien was or what the right of reimbursement was was evidence that I voluntarily provided to the court. There was no evidentiary materials attached in support of their motion to reduce, and it's their burden. Was there at the hearing on this motion any argument raised about why Blue Cross Blue Shield was not responding to this particular subpoena? They did not issue a subpoena prior to the original hearing on the motion. They never subpoenaed any documents until that happened afterwards when we decided we would like to file a motion to reconsider. We would like the court to consider additional evidence. And Blue Cross called me and said, I'm getting a bunch of calls from a lawyer. I said, I would ask that you work through me because there are issues of confidentiality between Charles Perkey, who I represent, and Blue Cross Blue Shield. And I had a lawyer who was calling them directly. And I did say, in order for me to protect my client, that the communication should occur through me. I absolutely did say that. But I never told them not to comply with the subpoena as was suggested here. Once the subpoena was issued and the notes in the record indicate that the person from Blue Cross Blue Shield turned it over to their legal department, we determined that determination. But there was no subpoena prior to the hearing on the original motion to reduce. What was the amount that Blue Cross Blue Shield actually paid? That's what I presented. I presented the amount that they paid was $134,933.85, as disclosed to me after the verdict was entered in this case. So it wasn't an old number, as counsel suggests. It was a number that I went to them after the verdict was entered. And why shouldn't the judgment be reduced by that amount? Because there is a right of reimbursement. And the plain language of the statute in New York says if there is a right, there is no reduction. And I think if we look at what is happening here and all of the potential arguments that are being made by the appellants here, what they are suggesting is that they can define the amount of claimed bills to increase the setup. They're saying it's $358,000 even though all we claimed was $311,000 because in my mind there was some follow-up treatment for the initial cancer which may or may not have been so. I had issues in the case. Your argument is that the purpose of the statute is to prevent the plaintiff from profiting, but at the same time your judgment should not be reduced because numbers are inflated, correct? Well, I'm not suggesting... This statute, if we look at everything that has been said by the Supreme Court, Wills v. Foster, since this statute was enacted, there's been a huge change in this issue to the extent that they rejected Peterson v. Lou Bacroft for it. They have said that if there are any benefits conferred upon, even if the plaintiff receives double compensation, it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall to the tort fees. It also says the wrongdoer should not benefit from the expenditures made by the injured party or take advantage of contracts or other relations that may exist between the injured party and third persons. These bills went in without objection. There was a stipulation that the bills were reasonable and customary charges. There was no dispute on that at the time of trial. And the plain language of the statute is that if there is a right of recovery, and York interpreting that statute, if there is a right of recovery, there is no reduction. And that was judge, the trial court's ruling on that issue. And specifically, there was a very detailed, specific order that set forth her findings, and that was one of them. Who is entitled to recover here? I mean, that apparently is a problem that the defendant's having. Well, this is another issue where a defendant is attempting to invade a contractual relationship between an insured and an insurer for its benefit. The plan language, the reimbursement provision itself says, Blue Cross Blue Shield says, You need to pay me back anything that we've paid. If you or your legal representative recover that, that's what the plan language says. That's the agreement that Charles Perkey and all of the people who benefited from him having health insurance are bound by. So what we are left with here is an argument that for purposes of this verdict, the defendant wants the trial court or this panel to say, Well, no, no, there's an administrator here. And we all know that there's only one way that Leigh Ann Perkey's survival action could be filed, and that is through the appointment of an administrator or someone to represent her. Once she passes, she can't file it. But what they are asking is let's reduce the amount of the verdict. And then I'm left or the plaintiff is left with arguing with Blue Cross Blue Shield and its reimbursement provision says, You know, if a legal representative makes this recovery, you owe us. And it doesn't say who that legal representative has to be. It doesn't have to be the spouse, as it was in this case. It could be anyone. Correct. As I read it. Blue Cross and Blue Shield shall have the right to first reimbursement out of all funds. You, your covered dependents or legal representative are or were able to obtain. So I don't think that any reasonable assessment of what the statute was designed to do includes the defendant being able. If you were to take their argument, I claim $311,000 in bills. They're saying, Oh, no, no, they paid 358. If I if I would have received more of the plaintiff would have received more than non-economic damages, they would argue that they are entitled to a set off greater than the amount that was actually recovered at the time of trial. That would be their argument, which which can't be the way this statute is applied. Nor should they be able to benefit from a contractual relationship where my client obtained health insurance, which covered he and his wife. Nor should they be able to invade that contract and say, well, for purposes of the legal case, if there is an administrator, there is no right of recoupment. But plaintiff, you have to deal with the plan language thereafter, which is what they're suggesting to the court. And what they're also suggesting to the court is that the defendant should somehow benefit from a reduction in the lien pursuant to the common fund. Which which which reduction exists based upon the creation of a fund by the plaintiff. They want to benefit from that as well. So their interpretation, given what they're asking, can't be the way it just can't be the way that this statute was ever envisioned to be interpreted. This can't be the first time this has been raised in York is not a new case. I mean, it's it's been out there. Is there anything more current, anything more definitive? I know my personal experience isn't pertinent, but this is the first time an emotion of this nature has ever been filed in any case that malpractice case that I've been involved in. And I don't I couldn't find another case other than York. And there wasn't another case other than York cited by the appellant in this case. Your time is up, counsel. So if you'd like to summarize your request. Just under under the any under the any evidence standard, the testimony of Dr. Ruben was appropriate. The jury instruction adequately instructed the jury and accurately instructed the jury. And I would request that this court deny the appeal. Thank you. Mr. Thank you, Your Honor. First, I'd like to object to several new arguments that I believe were just asserted by plaintiff's counsel. I hadn't heard anything in the briefs or anywhere in the case about the new Supreme Court case that he was talking about that modifies the new background. I don't think that's in the briefs. I don't believe that counsel in the briefs ever disputed the three hundred fifty eight thousand dollar figure. He's now saying that he has a problem with it, that he wants the court to consider that to be three hundred and eleven thousand. I mean, his his he submitted all the bills but requested a certain amount. Isn't that correct? He didn't request three. The bills were submitted, but he requested three hundred and eleven thousand. And that's what he got. Isn't that what happened at trial? I'm not sure about that. Okay. Three hundred fifty eight thousand, I believe, was the uncontroverted proof from Blue Cross Blue Shield as to what they had paid for the treatment of Nan Perkins. And what was the actual jury award? What did they award? It was three hundred ten thousand dollars. Okay. So that's what he got. Correct? Yes. So why is that a new argument? Because he's off a thousand dollars? Well, it does affect the amount of the set up. Also, there was no argument in the briefs that I recall about the common fund doctrine. On the standard of care issue, counsel said, as he said in his brief, that there was no objection to Dr. Rubin's 80 percent testimony. It's not the issue. It's admissible testimony. She can say whatever she wants. The issue that we raised is, is the sufficiency of that testimony to support the verdict? There was no objection to be made to her saying that. It just doesn't support the verdict is the point. On the instructional issue, the fact that an IPI instruction appears on the Supreme Court website is no different than the IPI appearing in the book. And the law is well established that just because an IPI instruction is in the book doesn't mean it's law. It has to be approved by a court, just as the instructions on the website. With respect to counsel's argument on the two. Do you dispute that the current, the current instruction includes the language of reasonably careful rather than reasonably well qualified? I'm not sure, Your Honor. It wasn't brought up in the briefs again. I wish I had the IPI with me, but I don't. Counsel says that any right of recoupment bars a reduction under the statute. I think as Justice Spence indicated, the language of the statute is to the extent of. More importantly, from my view, is that the plaintiff's construction of the statute is completely inconsistent with Witherell v. Weimer. It said the purpose of the statute is to prevent a double recovery. The concept that if there's any right to recoupment that bars any reduction, there's just nothing rational about that. It just doesn't make any sense. To be a right of recoupment for $1 and that would bar a reduction that otherwise could be in millions of dollars. There's nothing to support that. What if there is a speculative right of recoupment as to amount at the time of a motion such as this? What is the court to do? To the extent that there is a right of recoupment. What if they want, and that may not be our situation here, but what if they want $358,000, but it hasn't been paid in their negotiations going on? Should the court continue it until it's done? What's the court to do? You should get the whole $358,000 and they should get no medical bills? I'm confused about the issue. If the amount paid and the right of recoupment is not clear at that point, I do think the matter would have to be continued. The defendant has to file the motion within 30 days after the judgment, so that has to be done. But if the facts have not developed to conclusively show what's paid and what's payable and what the insurer is seeking to recover, I think the only possible alternative is for the court to continue it until those facts are hardened up. Did you call any witnesses from Blue Cross Blue Shield or their legal department or anybody to talk about what they wanted? We had documentation from Blue Cross Blue Shield. But would it have made sense possibly to have witnesses to testify about that? Because they can want the castle, but they may only get the throne room. So did you call someone to testify? I was in trial counsel. I don't know what efforts were made. It's not reflected in the record for sure. A point was made about the timing of when the subpoena was first issued. I think counsel is right. The subpoena was not issued until after the hearing on the motion for reduction. But I believe the court will find affidavits of defense counsel describing her efforts with Blue Cross Blue Shield before that time to obtain the information. So I think he's quite right. There was no subpoena, but other informal efforts were made, I believe, and that's shown by affidavit. And you were going to answer Justice Pence's question. Yes, I was. Your Honor, that was one of the sections on page 31 that you pointed to. That was one of our alternative arguments. 33, I believe. 33, right. That was the least favored of the alternatives. In that argument, we had sections 1, 2, and 3. One that began on page 28, we said the reduction should be $300,000 because there's no right of recruitment against the administrator. And section 2 that began on page 30 said if you accept Blue Cross Blue Shield's determination of its right of recruitment, the $89,000, then that would produce a certain result. And then section 3 of our argument that begins on page 31, which really is our least favorite, even if you accept plaintiff's version that Blue Cross Blue Shield is seeking $134,000 in recruitment, then this would be the analysis. So the 165 is if we lose our first two points. And it's the third alternative argument that we assert there. So we're trying to cover all the bases, but I think maybe we got a little too complex. But the interesting point is in each of the arguments, the amount, the basic amount is $300,000, which is right. It's in our ballpark of $310,000 or $311,000 as opposed to the $358,000 that is alleged to have been paid. So, again, I ask why is it a new argument? Because we take matters like this very seriously. If it is a new argument, we will have to deal with it. But why would it be new when this is the figure we're using throughout almost the entire time? Maybe I was being more focused on what I was hearing counsel saying. I thought you were saying I don't think $358,000 is the number. I think it's $311,000. I don't remember ever hearing that, and I don't really have a response. I can't come back and say no one's wrong about that. I'm just not prepared for it, so I raise the procedural point. I appreciate that. Thank you. Gentlemen, thank you for your arguments this morning. We will take the matter under advisement. A decision will be rendered in due course, and we'll stand in recess for a few moments to prepare for our next oral.